**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **GREG CLAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:** |
| | ) | |
| **WENDY WILLIAMS,** | ) | |
| **PATRICK ROBINSON,** | ) | **JURY TRIAL DEMANDED** |
| **MARVIN THOMAS,** | ) | |
| **FITZGERALD CLEMONS,** | ) | |
| **and** | ) | |
| **CERT OFFICERS JOHN DOE 1–10** | ) | |
| *in their individual capacities,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

On January 11, 2024, Plaintiff Greg Clay was beaten by members of the Alabama Department of Correction's Correctional Emergency Response Team ("CERT") during a CERT operation at Staton Correctional Facility. As Greg walked—calmly and with his hands behind his back—to where a CERT officer had directed him, that officer hit him in the back of the head with a baton. Other CERT officers immediately joined the attack, punching Greg in the head, hitting him, and forcing him to the ground on his stomach. CERT officers kicked, stomped, and continued to punch Greg as he lay on the ground trying to shield himself from the blows.

The use of excessive force by CERT officers is endemic within Alabama's prisons, and Greg's assault was one of many incidents in the last several years during which CERT officers have used unnecessary and often brutal force against a compliant prisoner. Greg brings this action under 42 U.S.C. § 1983 against the CERT officers who beat him and the supervisors who created

and perpetuated the customs and policies that led to his beating for violations of his rights under the United States Constitution and Alabama State law.

## JURISDICTION AND VENUE

1. Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights conferred by the Eighth Amendment to the United States Constitution.

2. This Court has subject-matter jurisdiction over Plaintiff's constitutional claims under 28 U.S.C. §§ 1331 and 1343(a).

3. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

4. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

### *Plaintiff*

5. **Plaintiff Greg Clay** is over the age of nineteen and is incarcerated within the Alabama Department of Corrections ("ADOC" or "Department"). At the time of the filing of this Complaint, Greg was incarcerated at Ventress Correctional Facility ("Ventress") in Barbour County, Alabama. At all times relevant to this Complaint, Greg was incarcerated at Staton Correctional Facility ("Staton") in Elmore County, Alabama.

### *Defendants*

### *The Supervisory Defendants*

6. **Defendant Wendy Williams** is over the age of nineteen, and she was the Deputy Commissioner of Men's Services for the ADOC at all times relevant to this Complaint. She held that position from in or about January 2022 through in or about September 2024. As Deputy

Commissioner, Defendant Williams was responsible for ensuring the effective and safe daily operations of all the facilities under her supervision, including Staton. She was the point person on the Department's administrative team regarding institutional security issues, including all incidents of inmate-on-inmate violence and sexual assault, all incidents of officers using excessive force against prisoners, and all circumstances in which CERT was deployed to a facility to address institutional security issues. Defendant Williams also oversaw all aspects of institutional security at the facilities under her supervision, including Staton. This oversight included: reviewing facility incident reports and investigations related to inmate extortion, robbery, physical assault, and/or sexual assault; reviewing the facility-level investigations into officers' uses of force; reviewing internal audit reports; reviewing facility policies and practices related to use-of-force incidents, investigations, and associated disciplinary actions; reviewing personnel training records and practices; and monitoring and overseeing members of the leadership at the facilities under her supervision to ensure compliance with all directions, regulations, and policies. Defendant Williams was responsible for addressing violations of institutional policies and procedures, and she had the duty, ability, and authority to suggest or require modifications to those policies and procedures and to implement or supervise such changes as necessary to address any associated issue. As Deputy Commissioner, Defendant Williams was a final policymaker for the Department and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. She is sued in her individual capacity.

7.    **Defendant Patrick Robinson** is over the age of nineteen and is the Director of the ADOC's Correctional Emergency Response Team ("CERT"). As Director, Defendant Robinson oversees all CERT operations across the State of Alabama. He is responsible for setting, overseeing, and enforcing all policies, customs, and practices applicable to CERT operations. He

has the duty, ability, and authority to suggest or require changes to CERT policies, customs, and practices, and he is responsible for implementing and/or supervising or overseeing the implementation of any necessary changes. Defendant Robinson is responsible for planning, directing, controlling, and otherwise managing all CERT operations statewide; investigating, disciplining, and deterring CERT officer misconduct, including inappropriate or excessive uses of force; and ensuring the safety and security of all prisoners subject to CERT operations. As Director of CERT, he remains aware of trends within CERT, including trends related to uses of force and uses of excessive force. Defendant Robinson is a final policymaker for CERT, and he has a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

8.     **Defendant Marvin Thomas** is over the age of nineteen and is the Commander of Central CERT, a regional CERT subdivision. As Commander, Defendant Thomas supervises and/or assists in supervising all CERT operations within the ADOC's central-region prisons, including Staton. Defendant Thomas is responsible for: supervising and monitoring CERT operations; ensuring the safety and security of all prisoners subject to CERT operations; ensuring the adequate supervision, discipline, and training of all subordinate CERT officers; investigating, disciplining, and deterring subordinate CERT officer misconduct, including inappropriate or excessive uses of force. As Central CERT Commander, he shapes the culture and practices of Central CERT officers and remains aware of trends within CERT, including trends related to uses of force and uses of excessive force. Defendant Thomas is a final policymaker for Central CERT, and he has a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

9.    **Defendant Fitzgerald Clemons** is over the age of nineteen and is the Central CERT Team Leader. As Team Leader, Defendant Clemons is responsible for: supervising and monitoring CERT operations; ensuring the safety and security of all prisoners subject to CERT operations; ensuring the adequate supervision, discipline, and training of all subordinate CERT officers; monitoring, investigating, disciplining, and deterring subordinate CERT officer misconduct, including inappropriate or excessive uses of force. Defendant Clemons shapes the culture and practices of Central CERT officers and remains aware of trends within CERT, including trends related to uses of force and uses of excessive force. Defendant Clemons has a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. He is sued in his individual capacity.

10.    Collectively, Defendants Williams, Robinson, Thomas, and Clemons are referred to as the "Supervisory Defendants."

### *The Defendant CERT Officers*

11.    **Defendant CERT Officers John Doe 1–10** are over the age of nineteen and were CERT officers at all times relevant to this Complaint. As CERT officers, Defendant CERT Officers Doe 1–10 were responsible for the safety and security of all prisoners subject to the CERT operations these defendants were involved in. This responsibility included: not using excessive force against prisoners; taking reasonable action to stop other CERT officers and/or ADOC employees from using excessive force against prisoners; and taking reasonable action to protect all prisoners within the ADOC from any known, substantial risk of serious harm of being subjected to excessive force. Defendant CERT Officers Doe 1–10 each had a duty to exercise ordinary and reasonable care for the protection of all people present during CERT operations. Each officer is sued in his individual capacity.

12.    Collectively, Defendant CERT Officers Doe 1–10 are referred to as the "Defendant CERT Officers."

## FACTUAL ALLEGATIONS

### *CERT and Operation Restore Order at Staton*

13.    CERT is comprised of ADOC correctional officers who have gone through specialized training to respond to disturbances, cell extractions, mass contraband searches, riot control, and emergency situations within Alabama's correctional facilities. CERT is the ADOC's equivalent of a police department's SWAT team.

14.    CERT is divided into four units: Northern CERT, North-Central CERT, Central CERT, and South-Central CERT.

15.    During CERT operations, CERT officers are usually equipped with specialized tactical gear beyond that issued to typical correctional officers. During operations, CERT officers often carry and use tactical shields, extra-long batons, flash-bang shotguns, impact-munitions shotguns, and chemical munitions such as Sabre Red pepper spray, a professional-grade, large-volume version of the pepper spray ADOC's correctional officers usually carry. CERT officers often wear tactical helmets, full-face balaclavas and all-black clothing during operations.

16.    In late 2023, several widely publicized inmate-on-inmate murders and assaults occurred at Staton. At that time, conditions at Staton were deplorable. Dozens of inmates had been banned from their assigned racks by other inmates and forced to sleep on benches, floors, in hallways, and even outside. Drug possession, sale, and use was open and rampant. Contraband cell phones and electronics were ubiquitous. Extortion, robbery, and physical and sexual assaults were commonplace.

17.     Upon information and belief, Defendant Williams visited Staton in December 2023 or January 2024 and observed these conditions. In response, and knowing CERT's reputation for violence, she ensured that CERT was dispatched to Staton to regain control of the prison in what was referred to as "Operation Restore Order."

18.     Operation Restore Order began on January 10, 2024. That day, CERT officers flooded the prison.[1] They conducted a prison-wide "shakedown," searching for contraband of any kind. They confiscated not only drugs, weapons, and electronics, but also extra mattresses, blankets, and even clothing and commissary items. They returned all inmates to their assigned housing units and beds and conducted a Master Roster Count.[2]

19.     CERT maintained a constant presence of several dozen officers at Staton for at least the next thirty days to help solidify the changes from their shakedowns and reorganizations.

### Greg's Beating

20.     Greg entered the ADOC in 2008 at the age of nineteen. As of January 2024, he had been incarcerated for more than fifteen years. Greg had recently been transferred to Staton and had been there for about two months, assigned to D-3 (D-dorm, Bay 3).

21.     On January 11, 2024, the second day of CERT's large-scale operation at Staton, CERT officers were helping to conduct the morning institutional count throughout the facility, including in D-dorm.

22.     D-dorm has a common area called a "dayroom" that sits between Bays 1 and 3 of the dorm. That morning, inmates from D-3 were in the dayroom, as were several CERT officers.

---

[1] Upon information and belief, approximately ninety CERT officers were present at Staton on January 10, 2024.

[2] A Master Roster Count involves verifying that each prisoner is on his assigned bed ("rack") or in his assigned cell. This is in contrast to the more frequent institutional counts, which merely ensure that the correct number of prisoners are present in the facility.

23.    CERT officers were also present throughout D-3, but they had not yet given any instructions; at that point, they were primarily maintaining an intimidating presence in the dorm.

24.    Greg was in the main area of D-3 when another inmate told him that two of his friends were potentially having issues with CERT officers in the dayroom. Greg walked to the dayroom door and made eye contact with his friends. He asked them if they were okay and reminded them to "keep [their] heads" and "not act outside [their] character." He then headed back into the main area of D-3, knowing that the institutional count would begin soon.

25.    About ten minutes later, a commotion erupted in the dayroom, and inmates and CERT officers began yelling.

26.    Greg then went to his rack and lay as inmates are directed to lie when CERT conducts the institutional count: on his stomach with his feet crossed and his hands on the back of his head.

27.    Shortly after Greg lay down, Defendant CERT Officer Doe 1 called out from near the front of the bay, "Where's the guy with the V-neck and the muscles?"

28.    Greg fit that description, so he raised his hand and said, "Right here, sir."

29.    Defendant CERT Officer Doe 1 beckoned Greg to come forward to an area near the front of the bay where the Defendant CERT Officers and Defendant Clemons were all gathered. Greg did so, walking with his hands behind his back, attempting to convey that he was relaxed and submissive.

30.    As Greg passed by Defendant CERT Officer Doe 1, Defendant CERT Officer Doe 1 smacked Greg in the back of the head with his baton.

31.    Surprised, Greg turned to his left to look at Defendant CERT Officer Doe 1. As he did so, Defendant CERT Officer Doe 2 punched him with a closed fist on the left side of his head.

8

32.     Defendants CERT Officers Does 1–2 both punched, hit, and shoved Greg, trying to force him onto his stomach on the ground. Defendants CERT Officers Does 3–10 joined in, also hitting, punching, and kicking at Greg.

33.     While trying to shove Greg to the ground, the Defendant CERT Officers ended up pushing him facedown onto a nearby rack. They continued to assault Greg as he lay on his stomach on the rack.

34.     Greg eventually fell off the rack onto the ground, where the Defendant CERT Officers continued to punch, hit, and kick Greg as he lay on the ground trying to protect himself from the blows.

35.     As he was being beaten on the floor, at least one of the Defendant CERT Officers tried repeatedly to hold Greg's head to the ground with one cheek directly on the floor—the sort of position that would enable someone to stomp on Greg's face easily. Greg tried to keep his head from being immobilized and sought to shield himself from the many blows.

36.     The Defendant CERT Officers continued to beat Greg for several minutes saying, "Kill his ass," and "Stomp his motherfucking ass out." In an effort to deescalate the situation and remind the officers of the severity of their actions, Greg said several times, "Are you guys trying to kill me?"

37.     During Greg's beating, neither Defendant Clemons nor any of the Defendant CERT Officers tried to stop the Defendant CERT Officers from beating Greg.

38.     Eventually, Defendant Clemons said, "All right, that's enough." The Defendant CERT Officers stopped beating Greg.

39.     As Greg lay prone on the floor, one of the Defendant CERT Officers bound his wrists together with a zip tie, then pulled Greg onto his feet. That Defendant CERT Officer walked Greg out of D-dorm and toward the shift office.

40.     Greg was passed off to Defendant CERT Officer Doe 3, who continued to walk Greg to the shift office. As they were walking, Defendant CERT Officer Doe 3 slapped Greg in the back of the head.

41.     When they got to the shift office, Defendant CERT Officer Doe 3 told Greg to sit down and wait. Defendant Clemons was there, and Greg remarked to him that he had not done anything wrong and the Defendant CERT Officers had beat him without any reason. Defendant Clemons told Greg to shut up and go to the infirmary for a body chart.

42.     At the infirmary, medical staff cleaned the cut on the back of Greg's head and completed a body chart. Greg had several knots on his head and bruising across his side and back.

43.     Greg was taken from the infirmary to a holding cell at Staton. Several hours later, he was shipped to Kilby Correctional Facility and placed in lockup. In an attempt to cover up the Defendant CERT Officers' unjustified beating of Greg, Defendant Clemons wrote Greg a disciplinary falsely accusing him of inciting a riot. At Greg's disciplinary hearing, Defendant Clemons gave false testimony that resulted in Greg being found guilty of the disciplinary.

44.     Since the attack, Greg has suffered from anxiety, panic attacks, sleep disturbance, nightmares, and flashbacks related to the beating.

### *The Widespread History of Excessive Force by CERT Officers*

45.     In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions inside Alabama's prisons for men. Among other things, the

investigation examined whether Alabama adequately protects its prisoners from excessive force by correctional officers.[3]

46.    During its investigation, the DOJ: (a) conducted site visits at four of Alabama's prisons for men; (b) interviewed dozens of ADOC employees, including wardens, captains, medical and mental-health staff, and high-ranking ADOC officials; (c) interviewed prisoners and their family members; and (d) reviewed hundreds of thousands of pages of the ADOC's own documents related to uses of force and employee discipline between 2015 and 2019.

47.    In July 2020, the DOJ published a report documenting its findings about the use of excessive force throughout the ADOC (the "July 2020 Report").[4]

48.    The DOJ found that there was "reasonable cause to believe that the correctional officers within the [ADOC] frequently use excessive force on prisoners housed throughout Alabama's prisons for men"; that the use of excessive force was "pervasive" and "pursuant to a pattern or practice"; and that "[t]he systemic use of excessive force within Alabama's prisons for men violates the Eighth Amendment."[5]

49.    The DOJ identified several specific ways in which the ADOC's correctional officers frequently use unconstitutional excessive force against prisoners. It found that officers:

a.    "[U]se force in the absence of a physical threat," including against "restrained or compliant" prisoners.[6]

---

[3] Press Release, U.S. Dep't of Justice, *Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men* (Oct. 6, 2016), *available at* https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men.

[4] U.S. Dep't of Justice, *Investigation of Alabama's State Prisons for Men* (July 23, 2020) ("July 2020 Report"), *available at* https://www.justice.gov/crt/case-document/file/1297031/dl.

[5] *Id.* at 1, 7.

[6] *Id.* at 20.

b.      "[U]se force to punish prisoners when the prisoner's response or behavior may not accord with the officer's commands, even though the prisoner does not physically resist or present a reasonably perceived threat to others."[7]

c.      "[U]se chemical spray inappropriately. Prisoners who do not present a danger are frequently sprayed with chemical agents. . . . Chemical spray is regularly used as retribution."[8]

50.     The July 2020 Report detailed many specific examples of the "frequent uses of excessive force" throughout the ADOC.[9] Many, many more uses of excessive force have occurred throughout the ADOC in the years since.

51.     The use of excessive force by CERT officers occurs within this broader context of the ADOC's long history of excessive force. All CERT officers are employed by the ADOC as regular correctional officers, and they spend the majority of their workweek working in that capacity at ADOC facilities across the state. In doing so, they are privy to and a part of the ADOC's widespread history of excessive force.

52.     CERT officers, however, are especially notorious for engaging in unprovoked and extreme violence against prisoners. They often respond to the slightest indication of objection, resistance, or non-immediate compliance from prisoners with physical violence. It is common for CERT officers to physically assault a prisoner whom the officers merely *perceive* to be opposing or defying them. A prisoner who *actually* opposes or defies a CERT officer is likely to be brutally

---

[7] *Id.* at 14.

[8] *Id.* at 15.

[9] *Id.* at 1.

assaulted by multiple officers. CERT creates compliance—and the resulting semblance of order—through fear, intimidation, and brutality.

53.    The following incidents are examples of excessive force carried out by CERT officers during CERT operations.

54.    In 2016, the ADOC settled five different prisoners' excessive-force lawsuits, each of which stemmed from a single nighttime CERT operation at Holman prison. CERT officers beat multiple prisoners that night, and at least one man was transported to a hospital.

55.    In July 2018, a CERT officer beat a prisoner at Holman who was lying facedown on his bed with a baton for 15 to 20 minutes. The prisoner received medical treatment for his injuries only after he crawled to a phone and called his mother, who contacted the warden.

56.    In December 2018, CERT officers at Holman beat a prisoner in a wheelchair until he fell out of his wheelchair. They continued to beat and stomp on him until he lost consciousness and defecated himself.

57.    That same month, a CERT officer punched an inmate at Holman in the face without provocation, fracturing his nose.

58.    In January 2020, CERT officers handcuffed an inmate at Fountain, took him to a secluded area, and beat him. The inmate was taken to the hospital.

59.    In March 2020, an early morning CERT raid at Staton turned violent when multiple officers beat compliant inmates. Officers broke an inmate's arm, another inmate required stitches after an officer slammed his head into a bed, and an officer broke an inmate's hand with his baton.

60.    In April 2020, CERT officers hit sleeping inmates with batons at Ventress.

61.    In July 2020, a CERT officer at Staton punched a handcuffed inmate in the face and kicked him.

62.    In November 2020, a CERT officer rammed an inmate's head into a wall at Fountain.

63.    In May 2021, CERT officers beat a man at Bibb.

64.    In August 2021, CERT officers at Staton punched and hit people as they lay in their beds.

65.    In October 2021, CERT officers hit and slapped inmates without provocation during a shakedown at Bibb.

66.    In July 2022, CERT officers beat an inmate in the head and kicked him in a bathroom at Staton.

67.    In August 2022, CERT officers hit multiple inmates at Limestone, then bragged about "whooping ass."

68.    In September 2022, an inmate at Limestone was talking during chow, so CERT officers beat him.

69.    In November 2022, CERT officers took a man at Bibb into a room without cameras and punched him in the face.

70.    In February 2023, CERT officers hit and slapped inmates at Ventress.

71.    In March 2023, CERT officers at Ventress broke a mental health patient's jaw while he was in handcuffs.

72.    In August 2023, an inmate placed his hands on the wall of a corridor as CERT officers passed through. After frisking the inmate and finding no contraband, the officers shoved him onto the ground and beat him.

73.    In September 2023, a CERT officer slapped multiple inmates during a shakedown at Bibb.

74.    In November 2023, CERT officers beat an inmate at Easterling.

75.    In December 2023, a CERT officer assaulted an inmate at Kilby.

**_The Supervisory Defendants Failed to Respond Reasonably to the Frequent_**
**_Use of Excessive Force by CERT Officers_**

76.    Because of their positions in the ADOC, each Supervisory Defendant had the duty, ability, and authority to reduce the frequency with which CERT officers engaged in excessive force during CERT operations. Nevertheless, each Supervisory Defendant failed to take reasonable action to do so.

77.    Because of their positions in the ADOC, each Supervisory Defendant knew the policies, practices, and customs related to use-of-force incidents and investigations during CERT operations, and each Supervisory Defendant was responsible for ensuring that these policies, practices, and customs adequately protected prisoners subject to CERT operations from unconstitutional uses of force.

78.    Each Supervisory Defendant had the duty, ability, and authority to create and/or modify policies, practices, and customs during CERT operations in ways that would have reduced the incidence of excessive force during CERT operations.

79.    Each Supervisory Defendant had the duty, ability, and authority to manage, supervise, and/or oversee CERT operations in ways that would have reduced the incidence of excessive force during CERT operations.

80.    Each Supervisory Defendant also had the duty, ability, and authority to supervise, train, and/or discipline CERT officers in ways that would reduce the incidence of excessive force during CERT operations. Each Supervisory Defendant could have done so by (a) instructing the Supervisory Defendant's subordinate or subordinates to supervise, train, and/or discipline an offending CERT officer; or (b) suggesting, implementing, and/or enforcing policies and practices

that resulted in the supervision, training, and/or discipline of CERT officers who engaged in excessive force during CERT operations.

81.    Supervisory Defendants nevertheless failed—both individually and collectively—to take the above or any other reasonable corrective action to reduce the use of excessive force by CERT officers during CERT operations.

82.    Each of these failures described above, as well as other failures by the Supervisory Defendants that are yet unknown, caused Greg's beating.

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF THE EIGHTH AMENDMENT – EXCESSIVE FORCE**
**Against the Defendant CERT Officers**

83.    Plaintiff incorporates by reference Paragraphs 1–77 of this Complaint.

84.    As CERT officers, the Defendant CERT Officers were responsible for ensuring the safety and security of all prisoners subject to CERT operations, including Plaintiff.

85.    Instead, the Defendant CERT Officers used excessive, unnecessary, and unlawful force against Plaintiff when they individually and collectively punched, hit, and kicked Plaintiff, even though he was submissive and compliant and following the direction of Defendant CERT Officer Doe 1.

86.    In beating Plaintiff, the Defendant CERT Officers acted maliciously and sadistically with the intent to cause harm, not in a good-faith effort to maintain or restore discipline. These motives are demonstrated by several facts, including: (a) Plaintiff was walking calmly with his hands behind his back, physically demonstrating his submission and compliance; (b) Plaintiff followed all the orders and instructions given to him; and (c) Plaintiff never gave any verbal or physical indication that he intended to resist or oppose the Defendant CERT Officers.

87.     As a direct and proximate result of the Defendant CERT Officers' use of excessive force, Plaintiff suffered physical injury and ongoing emotional distress, including anxiety, panic attacks, nightmares, and flashbacks.

### COUNT II
### VIOLATION OF THE EIGHTH AMENDMENT – FAILURE TO INTERVENE
### Against the Defendant CERT Officers and Defendant Clemons

88.     Plaintiff incorporates by reference Paragraphs 1–84 of this Complaint.

89.     The Defendant CERT Officers and Defendant Clemons were each responsible for ensuring the safety and security of all prisoners subject to CERT operations, including Plaintiff. The Defendant CERT Officers and Defendant Clemons were therefore each obligated to take reasonable actions to prevent Plaintiff from being subjected to excessive force by other CERT officers, including by intervening to stop the use of excessive force against Plaintiff.

90.     The Defendant CERT Officers and Defendant Clemons all observed the Defendant CERT Officers using excessive, unnecessary, and unlawful force against Plaintiff when the Defendant CERT Officers individually and collectively punched, hit, and kicked Plaintiff, even though he was submissive and compliant and following the direction of Defendant CERT Officer Doe 1.

91.     The Defendant CERT Officers and Defendant Clemons each had the duty, ability, and authority to stop or mitigate the Defendant CERT Officers' use of excessive, unnecessary, and unlawful force against Plaintiff.

92.     Nevertheless, the Defendant CERT Officers and Defendant Clemons took no action at all to stop or mitigate the Defendant CERT Officers' assault of Plaintiff.

93.     As a direct and proximate result of the Defendant CERT Officers' use of excessive force, Plaintiff suffered physical injury and ongoing emotional distress, including anxiety, panic attacks, nightmares, and flashbacks.

### COUNT III
#### VIOLATION OF THE EIGHTH AMENDMENT – SUPERVISORY LIABILITY
#### Against the Supervisory Defendants

94.     Plaintiff incorporates by reference Paragraphs 1-84 of this Complaint.

95.     Through the actions described in Paragraphs 21-46 above, the Defendant CERT Officers violated Plaintiff's clearly established Eighth Amendment rights when they individually and collectively punched, hit, and kicked him, even though he was submissive and compliant and following the direction of Defendant CERT Officer Doe 1.

96.     Because of their positions within the ADOC, including their duties, responsibilities, ranges of knowledge, and domains of authority, as described more fully and specifically for each Supervisory Defendant in Paragraphs 6-9 above, each Supervisory Defendant knew of the widespread history of  CERT officers' uses of excessive force during CERT operations, but each Supervisory Defendant nevertheless failed to take any corrective action to minimize such uses of force.

97.     Because of their positions within the ADOC, as described more fully and specifically for each Supervisory Defendant in Paragraphs 6-9 above, each Supervisory Defendant had the duty, authority, and ability to take corrective action that would have minimized the use of excessive force against prisoners during CERT operations, but each Supervisory Defendant nevertheless failed to take any corrective action to minimize such uses of force.

98.     The failure by each Supervisory Defendant to take any action to minimize the use of excessive force against prisoners during CERT operations was done with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners subject to CERT operations, including Plaintiff, and was objectively unreasonable.

99.     As a result of each of the Supervisory Defendants' failures described above, Plaintiff suffered physical injury and ongoing emotional distress, including anxiety, panic attacks, nightmares, and flashbacks.

## COUNT IV
### STATE LAW NEGLIGENCE
### Against the Defendant CERT Officers

100.    Plaintiff incorporates by reference Paragraphs 1–77 of this Complaint.

101.    Each of the Defendant CERT Officers owes a duty to exercise ordinary and reasonable care for the protection of all prisoners subject to CERT operations, including Plaintiff.

102.    Each of the Defendant CERT Officers breached the standard of care he owes to Plaintiff by maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline when they punched, hit, and kicked Plaintiff, even though he was submissive and compliant and following the direction of Defendant CERT Officer Doe 1.

103.    As a direct and proximate result of the Defendant CERT Officers' breaches of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including anxiety, panic attacks, nightmares, and flashbacks.

104.    The risks and harms that the Defendant CERT Officers caused Plaintiff are within the scope of protection afforded by the duties the Defendant CERT Officers owe to Plaintiff.

## COUNT V
### STATE LAW NEGLIGENCE
### Against the Supervisory Defendants

105.    Plaintiff incorporates by reference Paragraphs 1–84 of this Complaint.

106.    Each Supervisory Defendant owed or owes a duty to exercise ordinary and reasonable care for the protection of all people subject to CERT operations, including Plaintiff.

107.    Each Supervisory Defendant breached the standard of care he or she owes or owed to Plaintiff by failing to take reasonable steps to reduce the incidence of excessive force by CERT officers.

108.    As a direct and proximate result of Supervisory Defendants' breaches of the duty of care they owe or owed to Plaintiff, the Defendant CERT Officers maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline when they punched, hit, and kicked Plaintiff, even though he was submissive and compliant and following the direction of Defendant CERT Officer Doe 1.

109.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including anxiety, panic attacks, nightmares, and flashbacks.

110.    The risks and harms the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owe or owed to Plaintiff.

## COUNT VI
### STATE LAW WANTONNESS
### Against the Defendant CERT Officers

111.    Plaintiff incorporates by reference Paragraphs 1–77 of this Complaint.

112.    Each of the Defendant CERT Officers owes a duty to exercise ordinary and reasonable care for the protection of all prisoners subject to CERT operations, including Plaintiff.

113.    Each of the Defendant CERT Officers breached the standard of care he owes to Plaintiff by maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline when they punched, hit, and kicked Plaintiff, even though he was submissive and compliant and following the direction of Defendant CERT Officer Doe 1.

114.    The Defendant CERT Officers' breaches of the duty they owe to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals subject to CERT operations.

115.    As a direct and proximate result of the Defendant CERT Officers' breaches of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including anxiety, panic attacks, nightmares, and flashbacks.

116.    The risks and harms that the Defendant CERT Officers caused Plaintiff are within the scope of protection afforded by the duties the Defendant CERT Officers owe to Plaintiff.

## COUNT VII
### STATE LAW WANTONNESS
### Against the Supervisory Defendants

117.    Plaintiff incorporates by reference Paragraphs 1-84 of this Complaint.

118.    Each Supervisory Defendant owed or owes a duty to exercise ordinary and reasonable care for the protection of all people subject to CERT operations, including Plaintiff.

119.    Each Supervisory Defendant breached the standard of care he or she owes or owed to Plaintiff by failing to take reasonable steps to reduce the incidence of excessive force by CERT officers.

120.    The Supervisory Defendants' breaches of the duty they owed or owe to Plaintiff amounted to a conscious and/or reckless disregard of the rights or safety of others, including the rights and safety of Plaintiff and all other individuals subject to CERT operations.

121.    As a direct and proximate result of Supervisory Defendants' breaches of the duty of care they owe or owed to Plaintiff, the Defendant CERT Officers maliciously and sadistically, with the intent to cause harm, and not in a good-faith effort to maintain or restore discipline when they punched, hit, and kicked Plaintiff, even though he was submissive and compliant and following the direction of Defendant CERT Officer Doe 1.

21

122.    As a direct and proximate result of the Supervisory Defendants' breach of the duty of care they owe to Plaintiff, Plaintiff suffered physical injury and ongoing emotional distress, including anxiety, panic attacks, nightmares, and flashbacks.

123.    The risks and harms the Supervisory Defendants caused Plaintiff are within the scope of protection afforded by the duties the Supervisory Defendants owed or owes to Plaintiff.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court enter judgment against all the defendants, jointly and severally, and also order as follows:

a.    Find in favor of Plaintiff on all counts;

b.    Award compensatory damages to Plaintiff, against all defendants, in an amount to be determined at trial;

c.    Award punitive damages to Plaintiff, and against all defendants, in an amount to be determined at trial;

d.    Award Plaintiff recovery of attorneys' fees and other costs; and

e.    Award any other relief the Court deems appropriate.

Plaintiff demands a trial by jury.


Respectfully submitted this 10th day of January 2026.

*/s/ Susanne Emily Cordner*
Susanne Emily Cordner
(ASB-4687-C61N)
Lillian McLemore
(ASB-7561-W44E)
Joseph Mitchell McGuire
(ASB-8317-S69M)
*McGuire & Associates, LLC*
31 Clayton Street
Montgomery, Alabama 36104

334-517-1000
scordner@mandabusinesslaw.com
lmclemore@mandabusinesslaw.com
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*